UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| MATTHEW R. BONNE, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 3:04-CV-440 |
| ) | (PHILLIPS/GUYTON) |
| PREMIER ATHLETICS, et al., ) | |
| ) | |
| Defendants. ) | |

## **MEMORANDUM AND ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636(b), the Rules of this Court, and by the Orders [Docs. 47, 53] of the Honorable Thomas W. Phillips, United States District Judge, for disposition of defendants USA Gymnastics' and United States Gymnastics Federation's Motion in Limine Daubert Challenge [Doc. 46] and defendant Premier Athletics, LLC's Motion in Limine Daubert Challenge. [Doc. 51] On October 1, 2007, the parties came before the Court for a hearing on the instant motions. Attorney Stephen Yeager was present on behalf of the plaintiffs, attorney John Baker was present on behalf of defendant Premier Athletics, LLC, and attorney Samuel Rutherford was present on behalf of defendants USA Gymnastics and United States Gymnastics Federation. The Court took the motions under advisement after the hearing and they are now ripe for adjudication.

Defendants USA Gymnastics ("USAG") and United States Gymnastics Federation ("USGF") move the Court to exclude the testimony of Dr. Frank Gomer, plaintiff's expert on proper safety procedures [Doc. 46], and defendant Premier Athletics, LLC ("Premier") has adopted

USAG's and USGF's motion. [Doc. 51] Defendants USAG, USGF, and Premier (collectively "Defendants") contend that the opinions are inadmissible as expert testimony, are irrelevant, and are overly prejudicial. Plaintiffs oppose Defendants' motions, arguing that the opinions are admissible, relevant, and not overly prejudicial.

I. BACKGROUND

This lawsuit arises from a fatal injury sustained by Jordan Tyler Bonne ("Jordan Bonne") during a gymnastics competition (the "Competition") hosted by Premier and sanctioned by USAG and USGF. [Doc. 30 at ¶ 7] Plaintiffs allege that, while performing a trampoline exercise during the Competition, Jordan Bonne, who was fifteen years old at the time of the incident and competing at the Junior Elite level, flew past the trampoline's padded end deck and struck his head on the unpadded concrete floor. [Id. at ¶ 8] Plaintiffs allege that Jordan Bonne's injuries were caused by defendant Premier's negligent failure to provide appropriate padding and spotting [Id. at ¶¶ 11-22] and defendants USAG's and USGF's negligent failure to provide the appropriate level of oversight and regulation of the Competition. [Id. at ¶¶ 23-31]

II. APPLICABLE LAW: ADMISSIBILITY OF EXPERT TESTIMONY

Defendants' motions challenge the admissibility of Dr. Gomer's testimony under Rule 702 of the Federal Rules of Evidence and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

2

> methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The trial judge must act as a gatekeeper, admitting only that expert testimony that is relevant and reliable. Daubert, 509 U.S. at 589. With regard to scientific knowledge, the trial court must initially determine whether the reasoning or methodology used is scientifically valid and is properly applied to the facts at issue in the trial. Id. To aid the trial court in this gatekeeping role, the Supreme Court has listed several key considerations: (1) whether the scientific knowledge can or has been tested; (2) whether the given theory or technique has been published or been the subject of peer review; (3) whether a known error rate exists; and (4) whether the theory enjoys general acceptance in the particular field. Id. at 592-94. The Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." Id. at 595. "[T]he test under Daubert is not the correctness of the expert's conclusions but the soundness of his methodology." Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311 (9th Cir. 1995).

Although Daubert centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-48 (1999); Berry v. City of Detroit, 25 F.3d 1342, 1350 (6th Cir. 1994). The trial court's objective "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152. The trial judge enjoys broad discretion in determining whether the factors listed in Daubert reasonably measure reliability in a given case. Id. at 153. The party proffering the expert testimony bears the burden of showing its admissibility under Rule 702 by a preponderance of the evidence. Daubert,

509 U.S. at 592 n. 10. With this framework in mind, the Court will now address Defendants' motions.

## III. DR. FRANK GOMER

Defendants move to exclude the plaintiffs' expert witness, Dr. Gomer, from testifying as to his opinions set forth in his affidavit dated May 6, 2006. [Doc. 46-3 at 22-24]. In support of their argument, Defendants contend that Dr. Gomer is not qualified to opine on the issues presented in his expert report; that Dr. Gomer's opinions invade the province of the jury; that Dr. Gomer's opinions are irrelevant; and that any testimony presented by Dr. Gomer is inadmissible under Rule 403 of the Federal Rules of Evidence because such testimony would be more prejudicial than probative. [Doc. 46] Plaintiffs oppose Defendants' motions, arguing that Dr. Gomer is qualified to offer expert testimony in this matter; that Dr. Gomer's testimony is reliable, relevant, and admissible; and that his testimony is not barred by the Rule 403 balancing test. [Doc. 55]

### A. Qualifications

The Court begins its analysis with the qualifications of Dr. Gomer. Dr. Gomer received a Bachelor of Science in Psychology from Colgate University and a Doctorate in Human Factors and Psychology from Washington University. [Doc. 55-6] After receiving his Doctorate in 1974, Dr. Gomer served approximately four years in the United States Air Force as a Senior Human Factors Engineer. [Id.] Dr. Gomer received an honorable discharge in 1977 and began working for what is now known as the Boeing Company. [Id.; Doc. 46-2 at 3] Dr. Gomer worked for the Boeing Company from 1977 to 1982 as a Systems and Human Factors Engineer. [Doc. 55-6] From 1982 to 1986, Dr. Gomer worked for the GP Strategies Corporation performing safety audits and safety consulting. [Id.; Doc. 46-2 at 4] Dr. Gomer next worked from 1986 through 1997 for

4

what is now known as Honeywell, Inc., initially as Manager of Systems and Human Factors Engineering, then as Program Manager of Next Generation Avionics Systems, and finally as Director of Engineering for Electronic Display System Products. [Doc. 55-6] In 1986, and continuing to the present, Dr. Gomer also founded the Gomer Consulting Group, a private company through which Dr. Gomer provides safety consulting services. [Id.] From 1997 to 1998, Dr. Gomer served as the Vice President of Engineering, Operations, and Major Programs of Global Technologies, Ltd., and from 1999 to 2000 Dr. Gomer served as the President and Chief Operating Officer and Member of the Board of Directors of The Network Connection, Inc. [Id.] After 2000, Dr. Gomer began full time consulting through the Gomer Consulting Group. [Id.; Doc. 46-2 at 6-7] Prior to this time, Dr. Gomer's consulting business comprised approximately only two to three percent of this time annually. [Doc. 46-2 at 6]

Dr. Gomer's resume reveals that he has extensive experience in the field of human factors engineering and has performed extensive consulting in products liability and premises liability cases. [Doc. 55-9 at ¶ 1] However, Dr. Gomer admits that he is not an "expert on gymnastic events" [Doc. 46-3 at 16] and that he has only limited experience in the field of gymnastics. [Id. at 15] Thus, while Dr. Gomer has extensive experience in the science and methodology related to safety engineering, Dr. Gomer lacks any significant experience in the field of gymnastics, nor is there evidence that Dr. Gomer has previously applied the techniques of his chosen field to the area of gymnastics.

One of the issues Dr. Gomer's testimony addresses is whether the Defendants breached the standard of care in their oversight and organization of the Competition. In describing the standard of care associated with sporting events, the Tennessee Court of Appeals[1] has held that the liability of defendants involved in a negligence case arising from a sporting event "should be analyzed under the ordinary negligence standard of reasonable care under the circumstances." Becksfort v. Jackson, C.A. No. 02A01-9502-CV-00027, 1996 Tenn. App. LEXIS 257, at *9 (Tenn. Ct. App. April 30, 1996). The Becksfort court also recognized that "conduct which may be unreasonable in the midst of a public street may be entirely reasonable on a playing field or during the course of an athletic competition." Id. The court further held that

> We also note that the reasonableness of a person's conduct will be measured differently depending upon the particular sport involved and the likelihood and foreseeability of injury presented by participation in the particular sport. What is reasonable, acceptable, and even encouraged in the boxing ring or ice hockey ring, would be negligent or even reckless or intentional tortious conduct in the context of a game of golf or tennis. We should not fashion a different standard of care for each and every sport. We simply recognize that the reasonable conduct standard of care should be given different meaning in the context of different sports and athletic competitions.

Id. at *9 n. 4. Thus, the standard of care Defendants owed to Jordan Bonne turns upon the specific sport he was participating in, gymnastics.

In the instant case, it is clear that Dr. Gomer does have experience in the field of safety engineering, but he lacks any experience in the field of gymnastics. Without some experience and knowledge of the sport of gymnastics, Dr. Gomer lacks the frame of reference necessary to opine on a standard of care dependent "upon the particular sport [of gymanstics] . . . and the

---

[1] District Judge Thomas Phillips has ruled that Tennessee tort law governs Plaintiffs' negligence claims. [Doc. 34 at 9]

likelihood and foreseeability of injury presented by participation in [gymnastics]." Becksfort, 1996 Tenn. App. LEXIS 257, at *9 n. 4. Accordingly, the Court finds that Dr. Gomer is not qualified to offer an opinion as to the standard of care in this case.

As an additional basis for this holding, the Court found the case of Lueck v. City of Janesville, 204 N.W.2d 6 (Wis. 1973) persuasive. The Lueck court had to determine whether an expert could offer testimony as to whether a high school gym teacher had breached the standard of care in supervising students performing gymnastics. The Lueck court held that:

> Whether [the expert witness] would have personally handled it "more wisely" is not the test. What [the expert witness] would do and what the standard of care requires are two different things. The standard is what determines one's negligence and not what others may have personally done. A teacher should only be subjected to liability by the standards of care imposed by law and nothing more. Further, [the expert witness] admitted on cross-examination that not all of the experts in this field agree with his philosophy or opinion with respect to how a gymnastic course should be supervised and run. Lastly, when [the expert witness] asked whether a spotter, to a reasonable degree of certainty, would have prevented the accident, [the expert witness] said:
>
> "Yes, well very hypothetical, but in my opinion he could have prevented that accident, yes."
>
> Needless to say, an accident that "could have" been prevented is only a mere possibility and is different from saying it "would have" been prevented to a reasonable certainty.

Id. at 12. Given Dr. Gomer's lack of familiarity with the field of gymnastics, and the lack of evidence as to whether other gymnastics associations, such as in other countries, or other organizations supervising similarly dangerous sporting events perform the type of testing suggested

by Dr. Gomer,[2] it appears that Dr. Gomer, as with the expert in Lueck, is merely opining as to how he would have handled matters.

However, Dr. Gomer's experience in safety engineering does qualify him to form opinions as to the specific dimensions of the padding utilized during the Competition and his determination of where Jordan Bonne's head struck the concrete. Thus, the Court's Daubert analysis must continue with respect to the remainder of Dr. Gomer's offered opinions.

**B.     Principles and Methodology**

Having found that Dr. Gomer's qualifications satisfy Daubert on a limited basis, the Court must next determine whether Plaintiffs have demonstrated that the reasoning or methodology used by Dr. Gomer was valid and was properly applied to the facts at issue. See Daubert, 509 U.S. at 589.

In the instant case, Dr. Gomer studied the following sources in arriving at his opinion: Plaintiff's complaint; Defendants' answers; various depositions, with exhibits, taken in this matter; Jordan Boone's medical records; a videotape of the incident; "authoritative safety references;" and

---

[2]The Court notes that there is a brief reference in the record where Dr. Gomer stated that the design of football helmets is based upon empirical analysis and study. [Doc. 46-3 at 19] However, given the sparse nature of that reference, and the absence from the record of any such reports, the Court cannot perform its gatekeeping function under Daubert and determine whether such testimony would be relevant and reliable.

Additionally, Dr. Gomer's expert report did not indicate that he consulted such reports in forming his opinions, or that he even considered the practices used in other sports. The Federal Rules of Civil Procedure require an expert to disclose, in pertinent part, a "complete statement of all opinions to be expressed and the basis and reasons therefore; the data or other information considered by the witness in forming the opinions; [and] any exhibits to be used as a summary of or support for the opinions." Fed. R. Civ. P. 26(a)(2)(B). Given the absence of any reference in Dr. Gomer's expert report as to the safety practices used in other sports or other gymnastics venues, it would be inappropriate to allow Dr. Gomer to offer testimony at trial based upon those topics.

8

various regulations governing the Competition. [Doc. 55-9 at ¶¶ 3-4] A review of Dr. Gomer's deposition also suggests that Dr. Gomer relied upon poor quality, black and white photographs of the scene of the Competition taken by a Mr. Potter. [Doc. 46-3 at 11-12]

Dr. Gomer's second affidavit indicates that he relied upon the methodology of hazard analysis in conducting his investigation of this matter. [Doc. 55-7 at ¶ 5] Dr. Gomer describes the methodology of hazard analysis as follows:

> Hazard analysis involves a systematic approach to identify, evaluate and resolve hazards. First, dangerous conditions or hazardous activities are identified (e.g., falls from heights, associated with different fall trajectories in conjunction with trampoline exercises). Second, the risk(s) of harm (e.g., catastrophic injury or death) associated with the hazardous activity should be identified. Third, one should identify what hazard control methods can be implemented to prevent or reduce the risk of harm, such as better design, safety devices (e.g., the use of safety matting), warnings, instructions/procedures, or termination.

[Id. at ¶ 6] Dr. Gomer further states that:

> The hazard analysis methodology has been tested by the American National Standards Institute (ANSI), as well as the American Society of Safety Engineers (ASSE); second, the methodology has been subject to peer review by various professional organizations, including ASSE; third, the potential rate of error with regard to implementation of the methodology cannot be accurately quantified, but, if performed by a qualified safety engineer, the rate of error would be exceedingly small; and lastly, the methodology is widely accepted and used by other safety engineers.

[Id. at ¶ 7]

Thus, there is evidence that the methodology of hazard analysis: has been tested by ANSI and ASSE; has been subjected to peer review by ASSE; has a relatively small rate of error when properly applied; and is generally accepted in the field. Accordingly, the methodology of hazard analysis satisfies Daubert's reliability requirements. With respect to Defendants' argument

that Dr. Gomer's testimony is prepared solely for litigation, the Court finds those arguments unpersuasive. Dr. Gomer has taken the practices and methods used in his field of study and applied them to the facts of this case. Had Dr. Gomer never before performed hazard analysis, then Defendants' arguments would be correct.

However, while Dr. Gomer's testimony indicates that the methodology of hazard analysis does satisfy the requirements of <u>Daubert</u> and its progeny, Defendants argue that Dr. Gomer's calculations are inaccurate. Defendants' arguments are based upon Dr. Gomer's deposition, which contains the following exchange between Dr. Gomer and counsel for USAG:

> Q. Now, the first page of Exhibit 21[3] are some numbers and calculations, it looks like. Could you explain to me what those are?
>
> A. There was a discrepancy in the testimony offered by Ms. Simms and the testimony offered by Mr. Potter. Ms. Simms stated that the dimensions of the single mat placed underneath and beyond the end deck, the dimensions were 5 feet by 10 feet by 8 inches thick.
>
> Q. Okay.
>
> A. Mr. Potter stated in his deposition that he thought the dimensions were 6 feet by 10 feet by 8 inches thick, and it's extremely difficult with poor black-and-white copies of color photographs to try to gage [sic] what the actual dimensions of the mats at the time of this incident were. Mr. Potter, I believe, stated that he went back and photographed the same mats that were associated with the trampoline on which Jordan Bonne was injured.
>
> So I'm merely seeing if it's possible to determine if the dimensions of the mat placed under and beyond the end deck are identical to or similar to the dimensions of the safety mat placed on the end deck itself, **and I concluded that I can't really do it accurately from this poor black-and-white copy**. So the numbers are an attempt, but I can't do it and I need better photographic

---

[3]The Court notes that "Exhibit 21" does not appear to be in evidence.

> rendering to try to extrapolate dimensions given a difference of opinion between Mr. Potter and Ms. Simms.
>
> Q. So these numbers were your effort at extrapolating information, but they may not be accurate?
>
> A. **I know they're not accurate because these are not sufficient. The image quality is not sufficient to do it.**

[Doc. 46-2 at 18-19 (emphasis added)] In describing how he attempted to calculate the location where Jordan Bonne's head struck the floor, Dr. Gomer stated the following:

> A. In my affidavit I stated that it appeared to me in viewing the videotape and using the black-and-white copies of photographs taken by Mr. Potter that if the dimensions of the safety pad that should have extended beyond the end deck, if those dimensions were identical to the dimensions of the end deck itself, then given the manner in which he fell from the trampoline, Jordan Bonne's head would not have struck the concrete surface, rather his head would have struck the mat.
>
> That's in my affidavit. I mention to you that I used my still frame analysis of the videotape that I was provided to judge how far beyond the safety padding at the meet his head was when it struck the concrete floor.
>
> Q. Okay.
>
> A. There's another way of doing it and it corroborates the still frame analysis that I performed, and that is to take into account his stature. And the medical records provide his stature as 5 feet, 11 -- 5 feet, 10 inches. You can then go to an anthropomorphic table -- that's a body dimension table -- and you can calculate from the midpoint of the shoulders to the top of the head what the distance is. So these pages permit me to do that by analysis as well as then by review of videotape, so I leave it to you if you want to reference this and copy some pages and diagrams or not.

[Doc. 46-3 at 5-6] Later in the deposition, the following exchange between Dr. Gomer and USAG's counsel occurs regarding the size and location of the safety pads:

11

> Q. Now, the statement that you say that it's apparent, when viewing the video of Jordan's fall, had the safety mat extended 6.5 feet beyond the back of the end deck, comma, as interpreted by the USAG as the requirement at the time, comma, then Jordan would not have struck his head directly on the ceramic concrete floor, that's what we've already discussed when you were identifying this book and going from somebody that's 5 feet-10 and measuring what the normal person is from their mid shoulder up to their head would be that distance and if you take that distance and then take the 6.5 measurement from what you perceived the mat where it actually ended, that that [sic] is a conclusion that you reached?
>
> A. Certainly, in part, and it's in part in this sense. If the mat that was used at the time of this meet had dimensions of 10 feet by 5 feet, given the photographs taken by Mr. Potter, it appeared that to place the safety pad against the frame of the safety platform, it extended under the safety platform by about 12 inches.
>
> Now, apparently he took measurements - - my recollection in reading his deposition transcript was he had a tape measure. He took some measurements, but when Mr. Yeager asked him for the measurements and how far did it extend under the end deck, he - - either he couldn't find the measurements or he couldn't recall. So based upon my looking at the videotape and based upon my looking at the poor black-and-white copies of his photographs, it appears that that mat extended about a foot under the end deck.
>
> If its dimensions were 5 feet by 10 feet, that means that only 4 feet of the mat extended beyond the end deck. His head struck between 12 and 14 inches beyond that safety padding. If I add 12 to 14 inches to 4 feet, I get a little over 5 feet or 5 feet exactly. Certainly if you placed a mat whose dimensions were 6.5 feet and he appears to have fallen and struck the concrete at about 5 feet beyond the end deck, then 6.5 feet would have provided protection.

[Id. at 10-12]

Thus, it appears that Dr. Gomer's calculations as to the location of mats at the Competition and the location of where Jordan Bonne's head struck the concrete floor rely on his admittedly inaccurate calculations derived from the poor quality photograph. However, the Sixth Circuit has held that:

> The Daubert Court made it explicit that in determining the scientific validity and thus the "evidentiary reliability" of scientific evidence, "the focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 113 S. Ct. At 2797. Questions about the certainty of the scientific results are matters of weight for the jury. For example, in discussing the fact that a hair sampling technique only showed similarities between the hairs and could not show a match with certainty, "the lack of certainty went to the weight to be assigned to the testimony of the expert, not its admissibility, and defense counsel did a creditable job of arguing to the jury that it should be assigned little weight." United States v. Brady 595 F.2d 359, 363 (6th Cir. 1979). And, in general, criticisms touching on whether the lab made mistakes in arriving at its results are for the jury.

United States v. Bonds, 12 F.3d 540, 563 (6th Cir. 1993). Thus, any attack on the accuracy of Dr. Gomer's calculations raises a question of weight for the jury, not a question of admissibility.

Therefore, the Court finds that the methodology of hazard analysis is a recognized, reliable field of study, and Dr. Gomer's calculations as to the placement of the mats at the Competition and the location of where Jordan Bonne struck his head are relevant and will assist the trier of fact.

**C.     Ultimate Issue**

As a further basis for the Court's decision to preclude Dr. Gomer from testifying as to the standard of care in this matter, the Court finds that the opinions to be offered by Dr. Gomer express inadmissible legal conclusions. While Rule 704 of the Federal Rules of Evidence does not preclude an expert opinion that "embraces an ultimate issue to be decided by the trier of fact," the Sixth Circuit has held that "the issue embraced must be a factual one." Berry, 25 F.3d at 1353. In the instant case, Dr. Gomer takes the facts, analyzes them, and concludes that the Defendants were grossly negligent. Given that Dr. Gomer is not qualified to testify as to the standard of care in this matter, the issue of whether Defendants were negligent is not a factual determination, but is instead

13

simply Dr. Gomer's impermissible "legal" opinion based upon the facts as he has interpreted them. Thus, Dr. Gomer's opinion is inadmissible, because it does not merely embrace the ultimate issue, it seeks to completely weigh the evidence and resolve the matter without the jury's assistance.

**D.      Safety Regulations**

Finally, the Court notes that Dr. Gomer's opinions also touch on the various safety regulations governing the Competition. As the Court noted above, Dr. Gomer has no previous experience in the field of gymnastics, nor with the regulations at issue. Dr. Gomer, therefore, is not qualified to offer expert testimony as to the regulations. The Court's ruling does not preclude Dr. Gomer from offering non-expert, factual testimony as to the regulations, merely from offering opinions as to their interpretation. The admissibility of such testimony would necessarily depend upon the proper authentication of the regulations and other rules of evidence governing non-expert testimony. Given that the admissibility of such testimony will depend upon the evidentiary landscape at trial, that issue must be left to the District Court.

**E.      Rule 403**

Having determined that Dr. Gomer's calculations are relevant and will assist the trier of fact, the Court must next determine whether Dr. Gomer's testimony satisfies the balancing test of Rule 403 of the Federal Rules of Evidence. Rule 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, of needless presentation of cumulative evidence." Fed. R. Evid. 403. Defendants contend that Dr. Gomer's opinions are overly prejudicial, and thus should be excluded.

As the Court noted above, Dr. Gomer is not qualified to testify as to the standard of care in this case. With regard to the testimony surrounding Dr. Gomer's calculations and his determination that if the mats had been positioned differently, or if larger mats had been used, then Jordan Bonne would not have been injured, the Court finds that the admissibility of such testimony under Rule 403 will depend upon the evidence presented at trial. Should evidence be presented at trial to support Dr. Gomer's contentions that the mats should have been extended six and a half feet from the end deck, then Dr. Gomer's testimony that Jordan Bonne's accident could have been prevented had a mat been there is admissible and its probative value is not outweighed by the danger of unfair prejudice. Should there be no evidence presented at trial that the mats should have extended six and a half feet from the end deck, then any testimony concerning what would, or would not, have happened had the mats been there would be overly prejudicial and should be excluded.

## IV. CONCLUSION

For the reasons discussed above, the Court finds that Dr. Gomer is qualified to offer limited testimony in this matter. Accordingly, Defendants' motions [Docs. 46, 51] are hereby **GRANTED in part**, and **DENIED in part**. Furthermore, it is **ORDERED** that Dr. Gomer shall be precluded from offering testimony at trial as to the standard of care in this matter and as to whether the Defendants breached that standard of care. Dr. Gomer is also precluded from providing opinion testimony as to the regulations governing the Competition. Should the evidence presented at trial not support the theory that the mats at the Competition should have extended six and a half feet from the end deck, then Dr. Gomer shall be precluded from testifying as to his determination that had the mats extended six and a half feet from the end deck, Jordan Bonne's death could have been avoided. The Court finds that Dr. Gomer's calculations as to the placement of mats and the

location of where Jordan Bonne's head struck the concrete floor are reliable, relevant, and not overly prejudicial. The accuracy of Dr. Gomer's calculations, however, is an issue that must be left to the jury.

**IT IS SO ORDERED.**

ENTER:

      s/ H. Bruce Guyton
United States Magistrate Judge